Slip Op. 17-149

## UNITED STATES COURT OF INTERNATIONAL TRADE

KALLE USA, INC,

       Plaintiff,

v.

UNITED STATES,

       Defendant.

Before: Gary S. Katzmann, Judge

Court No.  13-00003

## <u>OPINION</u>

[Plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted.]

Dated: November 2, 2017

<u>Frederick Van Arnan, Jr.</u>, Barnes, Richardson, & Colburn, LLP, of New York, argued for plaintiff. Of counsel on the brief was <u>Alan Goggins</u>.

<u>Hardeep K. Josan</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were <u>Joyce R. Branda</u>, Acting Assistant Attorney General, <u>Amy M. Rubin</u>, Assistant Director, and <u>Lisa M. Gonzalo</u>, as Trial Attorney.  Of counsel on the brief was <u>Paula Smith</u>, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Department of Customs & Border Patrol of New York. With them on the supplemental brief was <u>Benjamin C. Mizer</u> and on the Defendant's Response to Court Order was <u>Chad A. Readler</u>, Acting Assistant Attorney General of New York.

Katzmann, Judge:   How should food casings composed of both textile and plastic be

classified for the purposes of determining what tariff rate should apply to their importation?   In

this action, Plaintiff Kalle USA Inc. ("Kalle") contests the denials of its administrative protests by

U.S. Customs and Border Protection ("Customs") and disputes the tariff classification under the

Harmonized Tariff Schedule of the United States (2010) (HTSUS)[1] which Customs determined for two of its food casing products, NaloProtex G1 ("G1") and NaloProtex G2 ("G2"). Specifically, Kalle contends that the G1 and G2 products—which are used for encasing raw sausage, scalded-emulsion sausage, cooked-meat emulsion sausage, ham and other processed meat products, and cheese—should be classified as plastics, while the United States ("the Government") argues that Customs correctly classified the casings as made up textile products.  Joint Statement of Undisputed Facts ¶ 4, Sept. 19, 2014, ECF No. 23 ("JSUF").  Before the court is Kalle's Motion for Summary Judgment ("Pl.'s Br.") and the Government's Cross Motion for Summary Judgment on behalf of Customs ("Def.'s Br.").  The court concludes that Customs correctly classified the G1 and G2 casings, and therefore denies Kalle's Motion for Summary Judgment and grants the Government's Cross Motion for Summary Judgment.

## **BACKGROUND**

**1.      The Merchandise at Issue**

*a.  Facts Common to Both NaloProtex G1 and NaloProtex G2 Casings*

The following facts are not in dispute.  The merchandise at issue is known as NaloProtex G1 and NaloProtex G2 casings ("G1 and G2 casings").  JSUF ¶ 2.  These products are imported into the United States from Germany by Kalle USA Inc.  Id.; Oral Argument, ECF No. 68.  The G1 and G2 products are casings used for encasing raw sausage, scalded-emulsion sausage, cooked-meat emulsion sausage, ham and other processed meat products, and can also be used for encasing cheese.  JSUF ¶ 4.

---

[1] All references to section notes, chapter notes, headings or subheadings contained herein are to 2010 HTSUS.

The starting material for both the G1 and G2 casings is a textile flat sheeting.  Id. ¶ 5.  The textile fabric portion of the casings is coated in plastic on one side, the outer side.  Id. ¶ 6.  U.S. Patent 8,147,933 B2, dated April 3, 2012, describes the Gl and G2 casings as "textile food casings" consisting of a "textile envelope" with a "longitudinal seam," and a plastic "coating applied in an amount to allow said textile structure to be recognized within the coated casing."  Id. ¶ 7.  The inner textile fabric layer and the outer plastic coating layer together provide a casing that has several desirable features, including the ability to absorb dyes and aroma substances and transfer these substances into the encased product.  Id. ¶ 8.  The textile material gives the casings strength and shape, and provides a matrix to hold the plastic coating.  Id. ¶ 9.  The textile material also ensures the mechanical stability of the casings.  Id. ¶ 10.  The plastic coating material "only fills the interstitial spaces between the textile fibers" and is applied in a thin enough layer that the textile structure of the casing is still recognizable.  Id.  ¶¶ 11–13.  The plastic coating serves to prevent moisture transmission both into and out of the casings.  Id. ¶ 14.  During manufacture of the G1 and G2 casings, the coated textile sheeting is trimmed to the appropriate width, folded over on its sides to form a tube, and then fixed with a seam by gluing.  Id. ¶ 15.  The casings are flexible.  Id. ¶ 16.  Both products are imported in rolls of flattened tubes which are wound around a cardboard core.  Id. ¶ 17.  Both G1 and G2 casings are used for the same applications.  Id. ¶ 18.  The key difference between the G1 and G2 casings is that the G2 casing is stronger and thinner than the G1, giving the G2 better tear strength and better machineability.  Id. ¶ 19.  After importation, Kalle cuts the G1 and G2 casings to lengths required by customers, impregnates the casings with flavors, and then sells the casings to the processed meat industry.  Id. ¶ 20.  Kalle's customers stuff the casings with cooked sausages, ham, or other processed meats to create finished products for end users.  Id. ¶ 21.

   b.  *Characteristics Particular to NaloProtex G1 Casings*

        The G1 casing was imported under one of the nine entries at issue, JJ8-0290211-I.  Id. ¶

34.  The commercial invoice describes NaloProtex G1 casings as "150-210-23 NaloProtex _ FP

Dia. 108 Flw. 165.0," with or without other words, letters, or numbers of description.  Id. ¶ 35.

The G1 product is described by Kalle in its marketing literature as a "textile barrier casing" with

transfer properties.  Id.  ¶ 36.  Pursuant to U.S. Customs and Border Protection Laboratory Report

Number CH20090925, dated October 5, 2009 ("Lab Report"), the outer surface of the G1 casing

consists of a rubber/plastic material and an inner surface layer of woven fabric.  Id.  ¶ 37.  The

woven fabric portion of the G1 casing is composed of 100%, by weight, man-made viscose rayon

and polyester fibers.  Id. ¶ 38; Lab Report.  The G1 casing is composed of approximately 63%

rubber/plastic and 37% woven fabric.  JSUF ¶ 39; Lab Report.  The rubber/plastic material is

composed of polyvinylidene chloride.  JSUF ¶ 40; Lab Report.  The woven fabric portion of the

G1 casing is a textile. JSUF ¶ 41.  The textile and plastic portions of the G1 casings are both

measurable layers.  Id. ¶ 42.  The textile portion of the G1 casing has a thickness of l80 μm, a

weight of 60g/m$^2$, and a cost of .64 Euro/165cm.  Id. ¶ 43.  The textile portion of the G1 casing is

coated in plastic on the outer surface.  Id. ¶ 44.  The plastic portion of the G1 casing has a thickness

of 30μm, a weight of 90g/m$^2$, and a cost of 1.10 Euro/165cm.  Id. ¶ 45.  The thickness of the textile

fabric portion of the G1 casing is six times greater than the thickness of the plastic coating.  Id. ¶

46.  The G1 casing comes in a variety of widths and diameters, ranging from 58 mm wide (when

flat) and 37 mm in diameter to 245 mm wide and 156 mm in diameter.  Id. ¶ 47.  All sizes of the

NaloProtex G1 casings are imported in 500 m rolls.  Id. ¶ 48 (as corrected).[2]

_____

[2] During Oral Argument on October 11, 2017, the parties moved to correct errors in the record,
stating that the G1 and G2 casings come in rolls of 500 m (meters), rather than the 500 mm
indicated in the JSUF. ECF No. 68. The court granted their motion.  Id.

*c. Characteristics Particular to NaloProtex G2 Casings*

Eight of the nine entries at issue contain G2 casings, including entry numbers JJ8-0289660-2, JJ8-0289688-3, JJ8-0289987-9, JJ8-0290123-8, JJ8-0290210-3, JJ8-0290213-7, JJ8-0290581-7, and JJ8-0290584-1.  Id. ¶ 22.  The NaloProtex G2 casings are designated on the commercial invoices as "NaloProtex G2" with or without other words, letters, or numbers of description.  Id. ¶ 23.  The G2 product is described by Kalle in its marketing literature as a "textile casing with barrier and transfer properties."  Id. ¶ 24.  The G2 casing consists of a high strength woven polyester fabric with a plastic polymer coating that is part acrylic and part polyvinylidene chloride. Id. ¶ 25.  The woven fabric of the NaloProtex G2 product is a textile.  Id. ¶ 26.  The textile and plastic portions of the G2 are both measurable layers.  Id. ¶ 27.  The textile fabric portion of the G2 casing has a thickness of 140 μm, a weight of 67 g/m², and a cost of .96 Euro/165cm.  Id. ¶ 28. The textile portion of the G2 casing is coated with plastic on the outer surface.  Id. ¶ 29.  The plastic portion of the G2 casing has a thickness of 20μm, a weight of 62 g/m², and a cost of .73 Euro/165 cm.  Id.  ¶ 30.  The thickness of the textile portion of the G2 is seven times greater than the thickness of the plastic coating.  Id. ¶ 31.  The G2 casings range in width (when flat) from 111 mm to 245 mm, and in diameter from 74 mm to 156 mm.  Id. ¶ 32.  All sizes of the G2 casings are imported in 500 m rolls.  Id. ¶ 33 (as corrected); see supra n.2.

**2.    Procedural History**

Kalle was the importer of record of nine entries of casings (described above) made through the port of Chicago, Illinois, between July 26, 2010 and August 11, 2010.  Summons, Jan. 4, 2013, ECF No. 1.  The entries were liquidated between June 10, 2011 and June 24, 2011 subheading 6307.90.98 HTSUS "Other made up articles, including dress patterns: . . . Other . . . Other" subject to duty at 7% ad valorem.  Id.; Def.'s Br. at 1.  Kalle—believing that the casings should have been

classified under subheading 3917.39.0050, HTSUS "Plastics and Articles thereof . . . Tubes, pipes

and hoses and fittings therefor (for example, joints, elbows, flanges), of plastics: . . .Other . . .

Other," subject to duty at 3.1%—contested the liquidations by filing a protest on September 10,

2011.  Summons; Pl.'s Br. at 1.  Customs denied the protest on November 5, 2012, based on the

reasoning from its earlier classification decisions involving the same products.[3]  Id.; see

HQ155323, Application for Further Review of protest No. 3901-10-100443:  Naloprotex G-1

Sausage Casing (March 30, 2012), Def.'s Br. Ex. A ("HQ155323"); NY N086782, The tariff

classification of sausage casings from China (Dec. 10, 2009), Def.'s Br. Ex. B ("NY N086782").

This action followed.  Kalle moved for summary judgment on September 29, 2014.  Pl.'s Br.  The

Government cross-moved for summary judgment on November 24, 2014.  Def.'s Br.

        Oral argument was held on September 24, 2015, and the court requested supplemental

briefing on October 9, 2015.  ECF No. 43.   Both parties filed their supplemental briefs on

November 20, 2015 and their supplemental replies on December 23, 2015.  Pl.'s Suppl. Br. 1, ECF

No. 47; Def.'s Suppl. Br. 1, ECF No. 48; Pl.'s Suppl. Reply 1, ECF No. 52; Def.'s Suppl. Reply

1, ECF No. 53.  The court again ordered supplemental briefing on March 7, 2016, and both parties

filed their supplemental briefs in response to that order on April 22, 2016.  Order, ECF No. 54;

Pl.'s Suppl. Br. 2, ECF No. 56; Def.'s Suppl. Br. 2, ECF No. 55.  Kalle and the Government also

filed supplemental replies on May 20, 2016.  Pl.'s Suppl. Reply 2, ECF No. 59; Def.'s Suppl.

Reply 2, ECF No. 60.

---

[3] Both HQ155323 and NY 086782 address protests and classification inquiries that occurred
prior to Protest 3901-11-100951--at issue here--and the record does not contain a separate report
specifically addressing Protest 3901-11-100951.  See HQ155323, NY N086782. But HQ155323
and NY 086782 involve the same G1 and G2 casings, and the Government states that these
earlier decisions contain the basis for Customs' classifications. Def.'s Br. at 7 n.4.

On August 10, 2017, the case was reassigned to a new judge, and oral argument was held

anew on October 11, 2017.  Reassignment Order, ECF No. 62; Oral Argument, ECF No. 68.

## APPLICABLE LAW

**1.      Jurisdiction and Standard of Review**

The Court has jurisdiction over this action under 28 U.S.C. § 1581(a) (2012), according to

which the court has jurisdiction over an action brought under section 515 of the Tariff Act of 1930

as amended, 19 U.S.C. § 1515 (2012) to contest a denial of a protest by customs.[4]

In a tariff classification case, the Court proceeds de novo. Park B. Smith, Ltd. v. United

States, 347 F.3d 922, 924 (Fed. Cir. 2003); see Customs Courts Act of 1980 § 301, 28 U.S.C. §

2640(a)(1)(2012) (directing the Court of International Trade to review classification rulings on

"the basis of the record made before the court").   The Court first considers whether "the

government's classification is correct, both independently and in comparison with the importer's

alternative."  Value Vinyls, Inc. v. United States, 568 F.3d 1374, 1377, 1380 (Fed. Cir. 2009);

Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).  The plaintiff has the burden

of showing the government's determined classification to be incorrect.  Park B. Smith, 347 F.3d

at 925; Jarvis, 733 F.2d at 876.  If the plaintiff meets that burden, the Court has an independent

duty to arrive at "the correct result, by whatever procedure is best suited to the case at hand."

Value Vinyls, 568 F.3d at 1377 (citing Jarvis, 733 F.2d at 878) (emphasis in original).

While the Court accords respect to Customs' classification rulings relative to their "power

to persuade," United States v. Mead Corp., 533 U.S. 218, 235 (2001) (citing Skidmore v. Swift &

Co., 323 U.S. 134, 140 (1944)), the Court also has "an independent responsibility to decide the

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19
of the U.S. Code, 2012 edition.

legal issue of the proper meaning and scope of HTSUS terms." Wilton Indus., Inc. v. United States,

741 F.3d 1263, 1265 (Fed. Cir. 2013) (citing Warner-Lambert Co. v. United States, 407 F.3d 1207,

1209 (Fed. Cir. 2005)).

**2.      Summary Judgment under Rule 56**

The Court grants summary judgment "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).

In a tariff classification action, summary judgment is appropriate when "the material facts of what

the merchandise is and what it does are not at issue."  Wilton Indus., 741 F.3d at 1266–67; Bausch

& Lomb, 148 F.3d 1363, 1365 (Fed. Cir. 1998).   In ruling on a summary judgment motion, the

Court credits the non-moving party's evidence and draws all inferences in that party's favor.  Hunt

v. Cromartie, 526 U.S. 541, 552 (1999) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

(1986)).   "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.   The

issue here is whether either the Government or Kalle is entitled to summary judgment.   The

analysis turns on the meaning and scope of the relevant tariff provisions.  See Wilton Indus., 741

F.3d at 1266–67; Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 (Fed. Cir. 1999); Bausch

& Lomb, 148 F.3d at 1365–66.

**3.      Tariff Classification under the General Rules of Interpretation HTSUS**

"In a classification case, the court construes the relevant (competing) classification

headings, a question of law; determines what the merchandise at issue is, a question of fact; and

then determines 'the proper classification under which [the merchandise] falls, the ultimate

question in every classification case and one that has always been treated as a question of law.'"

Bausch & Lomb, 148 F.3d at 1366; see Wilton Indus., 741 F.3d at 1266.  When there is no factual dispute regarding the merchandise, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions.  See Wilton Indus., 741 F.3d at 1266–67; Carl Zeiss, 195 F.3d at 1378; Bausch & Lomb, 148 F.3d at 1365–66.

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category."  Alcan Food Packaging (Shelbyville) v. United States, 773 F.3d 1364, 1366 (Fed. Cir. 2014) (quoting Wilton Indus., 741 F.3d at 1266).  The Court considers chapter and section notes of the HTSUS in resolving classification disputes because they are statutory law, not interpretative rules.  See Arko Foods Intern., Inc. v. United States, 654 F.3d 1361, 1364 (Fed. Cir. 2011) (citations omitted).  As such, they are binding on the Court.  See Park B. Smith, Ltd., 347 F.3d at 929.

Tariff classification is determined according to the General Rules of Interpretation ("GRIs"), and, if applicable, the Additional U.S. Rules of Interpretation ("ARIs").  The "General Rules of Interpretation govern classification of merchandise under the HTSUS, and are applied in numerical order."  Honda of Am. Mfg. v. United States, 607 F.3d 771, 773 (Fed. Cir. 2010) (internal quotations and citations omitted).

Under GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes."[5]  See Faus Grp., Inc. v. United States, 581 F.3d 1369,

---

[5] GRI 1 provides that:

> The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following [GRI] provisions.

1372 (Fed. Cir. 2009) (citing <u>Orlando Food Corp. v. United States</u>, 140 F.3d 1437, 1440 (Fed. Cir. 1998)).  Unless there is evidence of "contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings." <u>La Crosse Tech., Ltd. v. United States</u>, 723 F.3d 1353, 1358 (Fed. Cir. 2013); <u>Russell Stadelman & Co. v. United States</u>, 242 F.3d 1044, 1048 (Fed. Cir. 2001). In ascertaining a term's common meaning, the court may "consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used." <u>Baxter Healthcare Corp. v. United States</u>, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999);  <u>see Millennium Lumber Distrib., Ltd. v. United States</u>, 558 F.3d 1326, 1328–29 (Fed. Cir. 2009) (citation omitted); <u>Carl Zeiss</u>, 195 F.3d at 1379 (citation omitted). "Where a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best expresses the congressional intent." <u>Richards Med. Co. v. United States</u>, 910 F.2d 828, 830 (Fed. Cir. 1990).  Although not binding law, courts also look to the Explanatory Notes ("ENs") to the Harmonized Commodity Description and Coding System, maintained by the World Customs Organization, as persuasive authority on how to interpret and apply HTSUS provisions.  <u>See Home Depot</u>, 491 F.3d at 1336 ("Although the Explanatory Notes 'do not constitute controlling legislative history,' they are nonetheless intended to offer guidance in clarifying the scope of HTSUS subheadings." (citing <u>Mita Copystar Am. v. United States</u>, 21 F.3d 1079, 1082 (Fed. Cir. 1994))); <u>Deckers Outdoor Corp. v. United States</u>, 714 F.3d 1363, 1367 n.1 (Fed. Cir. 2013); <u>see generally Alcan Food Packaging (Shelbyville) v. United States</u>, 37 CIT ___, 929 F. Supp. 2d 1338 (2013) (relying extensively on the guidance provided by the ENs to resolve the case under GRI 1), <u>aff'd</u>, 771 F.3d 1364 (Fed. Cir. 2014).

"The HTSUS is designed so that most classification questions can be answered by GRI 1." <u>Telebrands Corp. v. United States</u>, 36 CIT___, ___, 865 F. Supp. 2d 1277, 1280 (2012), <u>aff'd</u>, 522

Fed. App'x 915 (Fed. Cir. 2013).  "What is clear from the legislative history of the World Customs

Organization and case law is that GRI 1 is paramount. . . .  The HTSUS is designed so that most

classification questions can be answered by GRI 1, so that there would be no need to delve into

the less precise inquiries presented by GRI 3."  Id.[6]  A product is classifiable under GRI 1 if it "is

described in whole by a single classification heading or subheading" of the HTSUS; however,

"[w]hen goods are in character or function something other than as described by a specific statutory

provision--either more limited or more diversified--and the difference is significant, then the goods

cannot be classified" pursuant to GRI 1.  La Crosse Tech., 723 F.3d at 1358 (quoting CamelBak

Prods., LLC v. United States, 649 F.3d 1361, 1364 (Fed. Cir. 2011)).

## DISCUSSION

Applying GRI 1, the court concludes that Customs correctly classified the G1 and G2

casings under heading 6307.90.98 ("Other made up articles, including dress patterns: . . . Other . .

. Other," subject to duty at 7% ad valorem) rather than under heading 3917.39.0050 ("Plastics and

Articles thereof . . . Tubes, pipes and hoses and fittings therefor (for example, joints, elbows,

flanges), of plastics: . . .Other . . . Other," subject to duty at 3.1%).  Heading 6307 covers "made

up" articles of textiles.  6307; Chapter 63, Note 1.  Given that G1 and G2 casings are composed of

a plastic-coated textile assembled into a casing by gluing, they meet the requirements of heading

6307.  JSUF ¶¶ 5–6, 15.  Kalle argues that the casings instead fall into heading 3917 because (1)

Section XI, Note 1(h) automatically excludes textile-plastic composites from Chapter 63; (2) even

if Note 1(h) does not exclude them, Chapter 59, Note 2 places them in Chapter 39; and (3) gluing

the ends of the textile-plastic sheeting together to make a tube does not meet the definition of

"made up" under Chapter 63.  The court concludes that (1) Section XI, Note 1(h) does not

---

[6] Regarding GRI 3 and sequential antecedent GRI 2, see infra n.7.

automatically exclude the casings from Chapter 63; (2) none of the provisions in Chapter 59, Note

2 that place products in Chapter 39 apply to the casings; and (3) the gluing process does fit the

requirements for "made up" as defined by the HTSUS provisions and case law.  Thus, the casings

were properly classified under 6307.  Because this case can be resolved under GRI 1, resort to the

subsequent sequenced GRI provisions, to which the parties refer in their alternative arguments, is

unnecessary.[7]

---

[7] Kalle argued in the alternative that, should GRI 1 not resolve the case, the casings would be
classified under heading 3917 according to GRI 3(a).  The Government, for its part, contended that
GRI 3(a) could not resolve the case and that the casings should be classified under heading 6307
according to GRI 3(b).

    GRI 2(b) provides that principles of GRI 3 should be applied to classify composite products
like the G1 and G2 casings when GRI 1 does not resolve the issue.  See GRI 2(b).  GRI 3(a) states
that:

> The heading which provides the most specific description shall be
> preferred to headings providing a more general description.
> However, when two or more headings each refer to part only of the
> materials or substances contained in mixed or composite goods or
> to part only of the items in a set put up for retail sale, those headings
> are to be regarded as equally specific in relation to those goods, even
> if one of them gives a more complete or precise description of the
> goods.

    Kalle argues that 3917 is more specific because, according to Chapter 39, Note 8,
heading 3917 explicitly includes sausage casings and other lay-flat tubing, while heading 6307
broadly covers "other made up articles."  Pl.'s Br. at 18–19.  The Government contends that the
two provisions are equally specific because (1) only headings themselves, and not chapter notes,
are considered under GRI 3(a); (2) the G1 and G2 casings can be used for food products other
than sausage, and thus are not "sausage casings;" and (3) GRI 3(a) explicitly states that "when
two or more headings each refer to part only of the materials or substances contained in mixed or
composite goods or to part only of the items in a set put up for retail sale, those headings are to
be regarded as equally specific in relation to those goods, even if one of them gives a more
complete or precise description of the goods."  Def.'s Br. at 24–26.

    The Government further argues that, because GRI 3(a) could not resolve the issue, the
casings should be classified under heading 6307 according to GRI 3(b), which states provides
that:

> Mixtures, composite goods consisting of different materials or made
> up of different components, and goods put up in sets for retail sale,

1.      **Application of GRI 1**

GRI 1 requires that the classification be determined "according to the terms of the headings

and any relative section or chapter notes."  The court thus first considers the headings identified

by the parties and any additional headings that might merit consideration.  See Park B. Smith, 347

F.3d at 928; Gerson Co. v. United States, 41 CIT ___, Slip Op. 17-96 (Aug. 2, 2017) (citing GRI

1), appeal filed, No. 18-1011 (Fed. Cir. Oct. 4, 2017).  Given that the casings are composed of

textile and plastic components, the court here considers provisions covering each type of material.

Kalle and the Government have identified 3917 and 6307, respectively, as the HTSUS headings

under which they believe the casings should be classified.  Because the texts of headings 5407 and

5903 also appear to address materials contained in the casings and are relevant for analyzing the

applicability of 6307 (discussed infra), the court considers those headings in its analysis as well.

See Value Vinyls, 568 F.3d at 1377 (citing Jarvis, 733 F.2d at 878) (stating that the court has an

independent duty to arrive at "the correct result, by whatever procedure is best suited to the case

at hand" (emphasis in original)).  These headings are listed in numerical order and with the heading

terms relevant to the classification issue presented by this case:

---

which cannot be classified by reference to 3(a), shall be classified as
if they consisted of the material or component which gives them
their essential character, insofar as this criterion is applicable.

The Government claims that the "essential character" of the casings is imparted by the
textile component because the textile performs the indispensable function of absorbing and
transferring dyes, aroma, and flavoring to encased food--which is marketed by Kalle as a primary
advantage of the G1 and G2 casings--and because the textile ensures mechanical stability.  Def.'s
Br. at 27–28.  Kalle, however, contends that the classification issue cannot be determined under
GRI 3(b), because both the textile's transfer qualities and the plastic's moisture control property
are equally indispensable to the casings' function, and thus, equally essential aspects of its
character.  Def.'s Reply Br. at 11.

As suggested by both parties and noted in the text supra, however, the court can resolve
this case according to GRI 1, and thus does not reach the parties' arguments under GRI 2(b), 3(a),
and 3(c).

3917    Tubes, pipes and hoses and fittings therefor (for example, joints, elbows, flanges), of plastics.

5407    Woven fabrics of synthetic filament yarn, including woven fabrics obtained from materials of heading 5404.

5903    Textile fabrics impregnated, coated, covered or laminated with plastics, other than those of heading 5902.

6307    Other made up articles, including dress patterns.

Heading 3917 is part of Section VII of HTSUS, and headings 5407, 5903, and 6307 are within Section XI.  The court now turns to a consideration of the relevant section and chapter notes for the headings.

a.   *Relevant Section, Chapter, and Explanatory Notes*

The court finds the following notes to be particularly relevant to the candidate headings and to the court's analysis overall.

i.   Chapter 39, Note 1

[In relevant part:]
"[t]he expression [plastics], however, does not apply to materials regarded as textile materials of section XI."

ii.   Chapter 39, Note 2(p)

"2. This chapter does not cover:

(p) Goods of section XI (textiles and textile articles)."

iii.   Chapter 39, Note 8

"For the purposes of heading 3917, the expression "tubes, pipes and hoses" means hollow products, whether semimanufactures or finished products, of a kind generally used for conveying, conducting or distributing gases or liquids (for example, ribbed garden hose, perforated tubes). This expression also includes sausage casings and other lay-flat tubing."

iv.   Chapter 39, Explanatory Notes

[In relevant part:]

"Plastics and textile combinations

Wall or ceiling coverings which comply with Note 9 to this Chapter are classified in heading 39.18. Otherwise, the classification of plastics and textile combinations is essentially governed by Note 1 (h) to Section XI, Note 3 to Chapter 56 and Note 2 to Chapter 59."

v.   <u>Section XI Note 1(h)</u>

"This section does not cover:

(h) Woven, knitted or crocheted fabrics, felt or nonwovens, impregnated, coated, covered or laminated with plastics, or articles thereof, of chapter 39."

vi.   <u>Section XI, Note 7(e)</u>

"For the purposes of this section, the expression "made up" means:

(e) Assembled by sewing, gumming or otherwise (other than piece goods consisting of two or more lengths of identical material joined end to end and piece goods composed of two or more textiles assembled in layers, whether or not padded)."

vii.   <u>Section XI, Note 8</u>

[In relevant part:]
"[f]or purposes of Chapters 50 to 60 . . . except where the context otherwise requires, Chapters 56 to 59 do not apply to goods made up within the meaning of [N]ote 7 above."

viii.   <u>Chapter 54, Note 1</u>

"Throughout the tariff schedule, the term "man-made fibers" means staple fibers and filaments of organic polymers produced by manufacturing processes, either:

(a) By polymerization of organic monomers to produce polymers such as polyamides, polyesters, polyolefins or polyurethanes, or by chemical modification of polymers produced by this process (for example, poly(vinyl alcohol) prepared by the hydrolysis of poly(vinyl acetate)); or

(b) By dissolution or chemical treatment of natural organic polymers (for example, cellulose) to produce polymers such as cuprammonium rayon (cupro) or viscose rayon, or by chemical modification of natural organic polymers (for example, cellulose, casein and other proteins, or alginic acid), to produce polymers such as cellulose acetate or alginates."

ix.   <u>Chapter 59, Note 1</u>

"Except where the context otherwise requires, for the purposes of this chapter the expression "textile fabrics" applies only to the woven fabrics of chapters 50 to 55 and headings 5803 and 5806, the braids and ornamental trimmings in the piece of heading 5808 and the knitted or crocheted fabrics of headings 6002 to 6006."

x.      Chapter 59, Note 2

"Heading 5903 applies to:

(a) Textile fabrics, impregnated, coated, covered or laminated with plastics, whatever the weight per square meter and whatever the nature of the plastic material (compact or cellular), other than:

(3) Products in which the textile fabric is either completely embedded in plastics or entirely coated or covered on both sides with such material, provided that such coating or covering can be seen with the naked eye with no account being taken of any resulting change of color (chapter 39);

(5) Plates, Sheets or strip of cellular plastics, combined with textile fabric, where the textile is present merely for reinforcing purposes (chapter 39)."

xi.     Chapter 63, Note 1

"Sub-Chapter I [63.01–63.07] applies only to made up articles, of any textile fabric."

xii.    Chapter 63, Explanatory Notes

[In relevant part:]

"This Chapter [63] includes:

(1) Under headings 63.01 to 63.07 (sub-Chapter I) made up textile articles of any textile fabric (woven or knitted fabric, felt, nonwovens, etc.) which are *not* more specifically described in other Chapters of Section XI or elsewhere in the Nomenclature. (The expression "made up textile articles" means articles made up in the sense defined in Note 7 to Section XI)." (emphasis in original).

b.   *Analysis*

The G1 and G2 casings are composite products of textile and plastic materials.  JSUF ¶¶ 5–6.  Although a "GRI 3(b) analysis is often applied to resolve classification disputes involving composite goods . . . here it is not necessary because both tariff provisions [3917 and 6307]

contemplate goods that have been combined with other materials." Alcan Food, 929 F. Supp. 2d at 1348; see Chapter 39, ENs; Chapter 59, Note 2; Chapter 63, ENs.

The Government argues that Customs correctly classified the G1 and G2 casings under heading 6307--"other made up articles" of textiles--because the casings are created by gluing the ends of sheets partially composed of textiles together, as described supra. 6307; JSUF ¶ 15. Kalle contends that the casings cannot be classified under heading 6307 for essentially three reasons. First, Kalle argues that Section XI, Note 1(h) excludes the casings from any consideration under Section XI because it states that Section XI does not include "fabrics…impregnated, coated, covered or laminated with plastics, or articles thereof, of chapter 39." Section XI, Note 1(h). Kalle advances a theory that "a section note would trump the chapter note[,]" and cites Mita Copystar, 160 F.3d at 714, for support. Pl.'s Br. at 11–12. Second, Kalle contends that, even if Section XI, Note 1(h) does not automatically exclude them, the casings fall within one of the exclusions to heading 5903 and therefore are properly classified in Chapter 39. Finally, Kalle submits that the casings are not "made up" and therefore cannot be covered by 6307.

The court concludes that the G1 and G2 casings are made up articles composed of a textile fabric under the HTSUS, and therefore are properly classified under heading 6307, for the reasons stated below.

i.    Section Notes Are Not Entitled to Greater Weight than Chapter Notes

The court is not persuaded by Kalle's assertion that section notes always trump chapter notes in a classification case. The court does not read Mita Copystar as standing for that proposition, although the Court of Appeals for the Federal Circuit happened to analyze Note 2 of section VI before analyzing Note 2(b) of Chapter 90 in that case. 160 F.3d at 711–14. Additionally, such an assertion is unsupported by the text of GRI 1, which does not state that a

section note trumps a chapter note, or indicate any preferential treatment for section notes over

chapter notes.  Instead, GRI 1 requires that the court apply "<u>any</u> relative section or chapter notes."

(emphasis added).  Further, Chapter 59, Note 2[8] and Chapter 56, Note 3[9]--which address chapters

contained within Section XI--distinguish, in detail, between products that belong in Chapter 39

and in Chapters 56 or 59.  If Section XI, Note 1(h) excluded all such textile-plastic composite

products, as Kalle suggests, then these provisions detailing how to determine which textile-plastic

composites are excluded from chapters within Section XI would serve no purpose.  Adopting

Kalle's interpretation would thus render these provisions surplusage.  Finally, the ENs to Chapter

39 instruct that, for products such as the sausage casings which are combinations of plastics and

---

[8] Chapter 59, Note 2 is set forth <u>supra</u> at pp.15–16.

[9] Chapter 56, Note 3 provides:

> "Headings 5602 and 5603 cover respectively felt and nonwovens, impregnated, coated, covered or laminated with plastics or rubber whatever the nature of these materials (compact or cellular).
>
> Heading 5603 also includes nonwovens in which plastics or rubber forms the bonding substance.
>
> Headings 5602 and 5603 do not, however, cover:
>
> > (a) Felt impregnated, coated, covered or laminated with plastics or rubber, containing 50 percent or less by weight of textile material or felt completely embedded in plastics or rubber (chapter 39 or 40);
> >
> > (b) Nonwovens, either completely embedded in plastics or rubber, or entirely coated or covered on both sides with such materials, provided that such coating or covering can be seen with the naked eye with no account being taken of any resulting change of color (chapter 39 or 40); or
> >
> > (c) Plates, sheets or strip of cellular plastics or cellular rubber combined with felt or nonwovens, where the textile material is present merely for reinforcing purposes (chapter 39 or 40).

textiles, "the classification of plastics and textile combinations is essentially governed by Note l(h)

to Section XI, Note 3 to Chapter 56  and Note 2 to Chapter 59," indicating that these three notes

should be considered together when Customs, or this Court, is making a classification

determination.  See ENs to Chapter 39.   In sum, the court finds Kalle's section note primacy

argument unavailing.

Assuming *arguendo* that section notes had priority over chapter notes, however, Section

XI, Note 1(h) would not automatically preclude the casings from being classified in Chapter 63.

Note 1(h) only states that Section XI does not include "fabrics… impregnated, coated, covered or

laminated with plastics, or articles thereof, of chapter 39," not that all such products are excluded.

Section XI, Note 1 (h) (emphasis added).   Thus, a product which is not classifiable under Chapter

39 would not be excluded from Section XI under Note 1(h).

The question remains: do the casings fall under Chapter 39?   Kalle's argument seems to

presume that, because heading 3917 covers "tubes, pipes and hoses…of plastic," including

"sausage casings and other lay-flat tubing" and the casings here are flattened, hollow tubes

partially made of plastic, they must be classified under 3917 and are therefore excluded from

Section XI by Note 1(h).  Pl.'s Br. at 8; see 3917; Chapter 39, Note 8; JSUF ¶ 17.   However, not

all such plastic tubes are classified under Chapter 39; in fact, Chapter 39, Notes 1 and 2(p) state

explicitly that Chapter 39 excludes goods covered by Section XI, indicating that some textile-

plastic composite products are classifiable under Section XI and not categorically excluded by

Section XI, Note 1(h).  Chapter 39, Note 1; Chapter 39, Note 2(p).   Further, as noted, supra, the

Chapter 39 ENs indicate that the court should look to not just Section XI, Note 1(h), but to Chapter

56, Note 3 and Chapter 59, Note 2 as well to distinguish between goods of Chapter 39 and Section

XI.  Indeed, based on an analysis of these provisions, the court concludes that the casings do not

belong in Chapter 39, but rather, under the Government's proffered heading 6307.  As required for

a product to be classified under 6307, the casings are (1) of any textile fabric and (2) made up, as

discussed below.  Chapter 63, Note 1; ENs, Chapter 63.

ii.     The Plastic and Textile Sheeting is a "Textile Fabric"

According to the undisputed facts, the woven portions of the G1 and G2 casings are textiles

created from, respectively, man-made viscose rayon and polyester fibers and a polyester fabric

that is part acrylic and part polyvinylidene chloride.  JSUF ¶¶ 25, 26, 38, 41.  The G1 and G2

casings are also coated in plastic.  JSUF ¶ 6.  Heading 5903 contains "textile fabrics impregnated,

coated, covered or laminated with plastics," including "the woven fabrics of chapters 50 to 55."

5903; Chapter 59, Note 1.  Heading 5407 contains "woven fabrics of synthetic filament yarn,

including woven fabrics obtained from materials of heading 5404."  5407.  Further, woven textiles

composed of the man-made materials such as those contained in the woven portion of the G1 and

G2 casings are considered textile fabrics under Chapter 54, as explicitly stated in Chapter 54, Note

1:

> Throughout the tariff schedule, the term "man-made fibers" means
> staple fibers and filaments of organic polymers produced by
> manufacturing processes, either:
>
> > (a) By polymerization of organic monomers to produce
> > polymers such as polyamides, polyesters, polyolefins or
> > polyurethanes, or by chemical modification of polymers
> > produced by this process (for example, poly(vinyl alcohol)
> > prepared by the hydrolysis of poly(vinyl acetate)); or
> >
> > (b) By dissolution or chemical treatment of natural organic
> > polymers (for example, cellulose) to produce polymers such
> > as cuprammonium rayon (cupro) or viscose rayon, or by
> > chemical modification of natural organic polymers (for
> > example, cellulose, casein and other proteins, or alginic
> > acid), to produce polymers such as cellulose acetate or
> > alginates.

Chapter 54, Note 1 (emphasis added).   Thus, the textile component in the G1 and G2 casings

appears to fall under heading 5903.

Heading 5903 does not contain all textile fabrics coated in plastic, however, as Section XI,

Note 1(h), and Chapter 59, Note 2, make clear.  Note 1(h) states that woven fabrics coated with

plastic and articles thereof that belong in Chapter 39 are excluded from all of Section XI, which

includes 5903.  Section XI, Note 1(h).  Chapter 59, Note 2(a) provides the exclusions relevant to

5903, two of which could potentially apply to the textile and plastic sheeting at issue here:

> (3) Products in which the textile fabric is either completely
> embedded in plastics or entirely coated or covered on both sides with
> such material, provided that such coating or covering can be seen
> with the naked eye with no account being taken of any resulting
> change of color (chapter 39);
>
> (5) Plates, Sheets or strip of cellular plastics, combined with textile
> fabric, where the textile is present merely for reinforcing purposes
> (chapter 39).

Chapter 59, Note 2(a).

The court turns first to Note 2(a)(3).  Under this provision, products must be (1) completely

embedded in plastics or (2) entirely coated or covered on both sides with plastic.  As has been

noted, courts give all terms "their common commercial meaning," relying on their own

understanding of the terms used, lexicographic and scientific authorities, dictionaries, and other

reliable information sources.  Millennium Lumber Distrib., 558 F.3d at 1328–29 (citation omitted);

Carl Zeiss, 195 F.3d at 1379 (citation omitted).

Webster's New World Dictionary defines "embedded" as "set or fix[ed] firmly in a

surrounding mass" and "completely" as "full[y], whole [ly], entire[ly]."  Webster's New World

Dictionary, Third College Edition 285, 442–443 (1988).  Thus, for a textile to be completely

embedded in plastic, it must be entirely firmly fixed in the plastic.  Here, it is undisputed that the

G1 and G2 casings are only coated on one side and that the coating material only fills the interstitial

spaces between the textile fibers.  JSUF ¶¶ 6, 13.  Thus, the textile is not embedded in the plastic

for the purposes of 2(a)(3).

Kalle, citing the <u>McGaw-Hill Dictionary of Scientific and Technical Terms</u> (Fifth Ed.

1994) and the <u>Shorter Oxford English Dictionary</u>, vol 1, A-M (Fifth Ed. 2002), provides a slightly

different definitions of "embed"--"[t]o enclose in a matrix; to surround" and "to fix firmly in a

surrounding mass of solids or semi-solid materials," respectively--and argues that the casing's one-

sided coating fits these definitions.  Pl.'s Suppl. Br. 1 at 8–9.  However, as the Government points

out:

> to "surround" means "to form an enclosure around; encompass" or
> "to be present on all or nearly all sides of; encircle." <u>Webster's New
> World Dictionary</u> (Third College Ed. 1988) (emphasis added). Here,
> it is undisputed that the textile fabric of the casings is coated with a
> thin layer of plastic <u>on only one side</u>. JSUF at ¶¶ 6, 12; <u>see also</u> Kalle
> Supp. Br. at 1, 9. Thus, the textile fabric is not "completely
> embedded" in plastics – <u>i.e.,</u> fully fixed on <u>all sides</u> in a surrounding
> mass of plastics.

Def.'s Suppl. Reply Br. 1 at 6 (emphasis original).

"Coated" means having "a layer of some substance, as paint, over a surface," while

"covered" means "to place something on, over, or in front of, so as to conceal, protect, or close."

<u>Webster's New World Dictionary</u> at 267, 320.  So, for a textile to be "entirely coated or covered

on both sides" with plastic, it must be completely coated or covered with the plastic material on

each side.

Although Kalle provides very similar definitions of "coated" and "entirely," it suggests

that because "the plastic completely and entirely coats one side of the textile fabric," it is "coated"

for purposes of 5903, Note 2(a)(3), and therefore should be properly classified in Chapter 39.  Pl.'s

Suppl. Br. 1 at 10–11.  But products must be coated on <u>both</u> sides, not just one, as shown by reading the plain text of the provision: "(3) Products in which the textile fabric is either completely embedded in <u>plastics or entirely coated or covered on both sides</u> with such material."  Chapter 59, Note 2 (emphasis added); <u>see</u> <u>Bradford Indus., Inc. v. United States</u>, 21 CIT 665, 668, 968 F. Supp. 732, 733, 736 (1997), <u>aff'd</u>, 152 F.3d 1339 (Fed. Cir. 1998) (finding, when addressing the related provision for nonwoven fabrics, that "Plaintiff failed to demonstrate that the nonwoven component of the subject merchandise is 'completely embedded' or 'entirely coated or covered'" because only one side of the fabric was coated or covered in plastic).  Here, it is undisputed that the G1 and G2 casings are only coated on one side and that the coating material only fills the interstitial spaces between the textile fibers.  JSUF ¶¶ 6, 13.  So, the casings are neither embedded nor covered or coated on both sides, and therefore do not fall within the Note 2(a)(3) exclusion.

Turning to Chapter 59, Note 2(a)(5), the court must interpret the meaning of "merely for reinforcing purposes."  Something "reinforcing" is "designed to provide additional strength (as in a weak area)."  <u>Webster's Third New International Dictionary</u> (unabridged) at 1915 (1993).  "Merely" means "no more than: barely, only, simply, solely."  <u>Id.</u> at 1413.  Taken together, the phrase means that the textile must have no other purpose beyond strengthening the plastic.

The court finds that the textile component serves purposes beyond merely reinforcing the plastic.  Here, it is undisputed that the textile also serves to "absorb dyes and aroma substances and transfer these substances to the encased [food] product."  JSUF ¶ 8.  According to the G1 patent, the textile "directly stores the dyes, aroma substances and/or flavorings and can release them to a food situated therein.  In contrast to [previous casings], the textile material simultaneously ensures the mechanical stability of the casing."  Patent 1.  The absorption and transfer properties conferred by the textile material are discussed extensively in the patent and

Kalle's advertising materials as one of the most important features of the product.  Patent; Pl.'s Br. Ex. E, Kalle Marketing Literature Pertaining to the NaloProtex G1; Pl.'s Br. Ex. D, Kalle Marketing Literature Pertaining to the NaloProtex G2.  Thus, since the casings serve more than a reinforcing purpose, the casings also do not fall within the 2(a)(5) exclusion.

The <u>Bradford</u> case further supports the court's interpretation of these provisions.  The court in <u>Bradford</u> interpreted the nearly identical HTSUS provisions and notes regarding nonwoven textile fabrics coated in plastic, and came to the same conclusions regarding the meaning of the terms.[10]  <u>Bradford Indus., Inc. v. United States</u>, 152 F.3d 1339 (Fed. Cir. 1998).  In addition, that court classified the products at issue there--imitation leather articles composed of a nonwoven textile component and polyurethane on one side--under the textile provision.  <u>Id.</u> at 1342.

For these reasons, the casings are composed of a textile fabric, as required for classification under 6307.[11]

   iii.    The Casings Are "Made Up"

The second requirement for classification under 6307 is that the article is "made up."  Section XI, Note 7(e) defines "made up" for the purposes of Chapter 63 as "[a]ssembled by sewing, gumming or otherwise."  Section XI, Note 7(e); ENs, Chapter 63.

According to Kalle, "[t]he gluing of one edge of the sausage casing to the other edge to form a tube is not an assembly, as that term involves two or more components being joined together, and does not apply to operations involving only one component."  Pl.'s Br. at 8.  Kalle

---

[10] Heading 5603 covers nonwoven textiles coated in plastic.  The exclusions contained in Chapter 56, Note 3--which is interpreted by the court in <u>Bradford</u>--are nearly identical to those in Chapter 59, Note 2, at issue here. <u>See</u> <u>supra</u> n.9.

[11] Chapter 59 does not include "made up" articles.  Because the court finds that the casings are made up, <u>see</u> <u>infra</u>, they cannot be classified under 5903. Section XI, Note 8.

cites The American Heritage Dictionary of The English Language, 110 (3rd Ed. 1992) (defining

assemble as "[t]o fit together the parts or pieces of") and ABB, Inc. v. United States, 421 F.3d

1274, 1276 (Fed. Cir. 2005) for support. ABB states that:

> [b]ecause the term "assemble" is not defined in the HTSUS, "its
> common or dictionary meaning" governs. Rohm & Haas Co. v.
> United States, 727 F.2d 1095, 1097 (Fed. Cir. 1984). According to
> Webster's Third New International Dictionary 131 (1993),
> 'assemble' means "to fit together various parts of [sic] so as to make
> into an operative whole." (Emphasis in original).

ABB, 421 F.3d at 1276.

Kalle also claims that L 'Eggs Products, Inc. v. United States, 13 CIT 40, 704 F. Supp.

1127 (1989) and Peg Bandage, Inc. v. United States, 17 CIT 1337 (1993) (not reported in the

Federal Supplement) buttress its argument concerning the definition of assembled, because both

cases, in addition to ABB, use the same definition. Pl.'s Reply at 7–8.

The court is not persuaded by Kalle's argument that the casings are not

"made up," and therefore cannot be covered by 6307. Pl.'s Br. at 8. Here, the tubes are

manufactured using two components: the textile-plastic sheeting and glue. Kalle's argument based

on L'Eggs and Peg Bandage is unavailing: the court instead finds that those cases support the

conclusion that the casings are "made up." In those cases, thread used to sew together a stocking

leg and a cloth bandage, respectively, was considered a second component for purposes of

assembly under 6307. L'Eggs, 13 CIT at 49–50; Peg Bandage, 17 CIT at 1348–49. The court

does not see how this principle is any different when considering the glue and the textile/plastic

sheet in this case.

Further, the court is not persuaded that "assembly," which is not defined by the HTSUS or

legislative history, requires the joining of two separate components. Although Kalle does rely on

one dictionary definition of assembly, Kalle ignores other definitions which make no mention of two different parts.  See, e.g., Webster's Third New International Dictionary, 131 (2002) (defining "assemble" as "2: to bring together: as a: to put or join together, usu. in an orderly way with logical selection or sequence"); The Random House Dictionary of the English Language, 89 (1969) (defining "assemble" as "2. to put or fit together").  Additionally, the Federal Circuit in ABB focused its definition of "assembl[ed]" on the creation of an "operative whole:" a "distinct and separate commercial entity" that, regardless of the number of parts, is "complete in itself" and capable of performing its function.  ABB, 421 F.3d at 1276–77.  Here, as the patent and undisputed record establish, one of the casings' purposes is to encase food.  See Patent; JSUF ¶ 4.  As defined by The Oxford English Dictionary Online, available at http://www.oed.com/view/Entry/61610?redirectedFrom=encase#eid (last visited Oct. 30, 2017), something is encased if it is "put into or enclose[d] within a case or receptacle" or "overla[id], surround[ed], or hem[med] in as with a case."  The textile-plastic composite material cannot do that until it is transformed from a flat sheet into a tube--a receptacle capable of surrounding or enclosing the food products--by the gluing process.  Thus, the textile-composite sheeting can only function as a casing--as an "operative whole"--once its sides are glued together.  Therefore, the casings fall within the definition of "assembled" and "made up" under Section XI, Note 7(e).

## CONCLUSION

Given that the casings are made up articles of textile fabric, they are properly classified under heading 6307.  Further, since goods of Section XI--which includes heading 6307--are excluded from Chapter 39, they cannot be classified under heading 3917.  Accordingly, the court denies Kalle's motion for summary judgment and grants the Government's cross motion for summary judgment.

So Ordered.

_/s/   Gary S. Katzmann_
Gary S. Katzmann, Judge

Dated: November 2, 2017
          New York, New York